**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

**TODD EDWARD EDMONDS** **PLAINTIFF**

**v.** **CIVIL ACTION NO. 3:06-CV-P301-H**

**JOHN D. REES, et al.** **DEFENDANTS**

**MEMORANDUM OPINION**

The plaintiff, Todd Edward Edmonds, filed a *pro se*, *in forma pauperis* complaint and amended complaint pursuant to 42 U.S.C. § 1983 (DN 1). This matter is before the Court for screening pursuant to 28 U.S.C. § 1915A and *McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997). As set forth below, the Court will dismiss certain claims and allow other claims to proceed.

**I. SUMMARY OF CLAIMS**

The plaintiff, who is currently incarcerated at the Eastern Kentucky Correctional Complex, names as defendants the following: John D. Rees, Commissioner of Kentucky Department of Corrections (KDOC); Martina Barnard, nurse at Kentucky State Reformatory (KSR); Sarah Sandelin, nurse at KDOC; Paula Holden, deputy warden at Roederer Correctional Complex (RCC); Lisa Crall, nurse at RCC; Ron Everson, doctor at Eastern Kentucky Correctional Complex (EKCC); Paige McGuire, deputy warden at KSR; Larry Chandler, warden at KSR; and Dr. Scott Haas, medical director at KDOC. He sues each defendant in his or her individual and official capacity. His complaint involves allegations that he has been denied treatment for Hepatitis C and that he was exposed to paint fumes, which caused him injury.

Specifically, the plaintiff alleges that on October 28, 2004, he was transferred to RCC from the Jefferson County Jail. He states that at the time of that transfer he was under doctor's

orders to receive treatment for his Hepatitis C and that that treatment was to continue until April 15, 2005. The plaintiff has attached to his complaint several letters from Dr. Bennett Cecil, who had been treating his Hepatitis C while he was incarcerated at the Jefferson County Jail. In a letter dated March 15, 2004, Dr. Cecil stated that the plaintiff's viral level on February 18, 2004, was 15,000 IU/mL, which showed that the "Pegasys + ribavirin treatment for [his] chronic hepatitis C [wa]s not working." Therefore, Dr. Cecil had asked the jail to discontinue that treatment but suggested that the plaintiff receive Infergen every day. An October 21, 2004, letter from Dr. Cecil to Judge Mershon stated that the plaintiff was responding to treatment, which consisting of daily Infergen injections along with Ribavirin. Dr. Cecil stated that the plaintiff was undetectable for the virus and that he planned to continue to treat the plaintiff until April 15, 2005. At that time, Dr. Cecil stated, if the plaintiff remained undetectable for the virus, the plaintiff would have about an 80% chance of staying negative for the virus.

The plaintiff also attaches to his amended complaint two orders from Judge Steve Mershon, Jefferson Circuit Court, in *Commonwealth v. Edmonds*, No. 01CR2382. In an order dated August 7, 2003, Judge Mershon requested that the DOC "assure that [the plaintiff] receives all medical treatment and medications recommended by Dr. Bennett Cecil." An order from Judge Mershon dated June 17, 2004, stated that all parties agreed that the plaintiff would stay under the care and treatment of Dr. Cecil "through and possibly beyond the original sentencing date of October 8th, 2004." However, that order also stated that "[t]he Court explained that the [DOC] would provide [the plaintiff] with treatment but the Court could not guarantee that he would continue on the same treatment regime or that Dr. Cecil would continue to treat him."

In his complaint, the plaintiff further alleges that, at the time of his transfer, he made the

medical department at RCC aware of the doctor's orders. He alleges that he spoke with Deputy Warden "Hogan"[1] about not receiving his Hepatitis C medication and also had family members, members of the Justice Resource Center, the ACLU, and a council woman call RCC regarding the fact that he had not received his Hepatitis-C medication. On November 22, 2004, he filed a grievance about not receiving his medication. In that grievance, he detailed that on October 29, 2004, he spoke to the medical department at RCC and shared with them federal and state court orders ordering that his treatment be continued. He also explained in that grievance that he was supposed to receive, among other things, an injection of Infergen every morning, along with Ribavirin. The grievance also contains the plaintiff's assertion that recent lab results showed that his Hepatitis C was worsening because he had not been receiving the treatment.

The plaintiff's grievance was denied on December 14, 2004, by the Health Care Grievance Committee, which found that the medical staff at RCC was following the DOC's protocol for treatment of Hepatitis C. In a December 14, 2004, letter from Dr. Cecil to the plaintiff, which the plaintiff has attached to his complaint, Dr. Cecil stated that he was sorry to hear that the plaintiff had been taken off of the treatment. Dr. Cecil stated that his treatment would have to be restarted but that he would have about a 90% chance of responding to daily Infergen injections plus Ribavirin since he had responded previously.

On January 10, 2005, the plaintiff appealed the denial of his grievance. In that appeal, he stated that he had been taken off of Pegasys in March 2004, but that the combination of Infergen and Ribavirin were working and that, according to Dr. Cecil, if he had stayed on that

[1] The Court assumes that the plaintiff is referring to Deputy Warden Holden, who is named as a defendant.

combination of medicines until April 15, 2005, he would have had an 80% chance of remaining negative for the virus. His appeal was denied on February 15, 2005.

The plaintiff further alleges that during December 2004 he was told by Nurse Crall to stop coming to the medical department because RCC does not treat inmates for Hepatitis C but that once he was transferred to KSR he would be treated. After being transferred to KSR in December 2004, he gave the medical department at KSR information about his treatment and copies of the court order and monthly reports to the court from Dr. Cecil. Attached to his complaint is a December 29, 2004, letter from the plaintiff to the governor asking for an investigation into the fact that his treatment for Hepatitis C had been stopped when he entered state custody and arguing that the DOC Hepatitis-C protocol does not work and is "sentenc[ing] to death" inmates with Hepatitis C. The plaintiff received a response from Commissioner Rees dated January 12, 2005, that he was not eligible for treatment under the DOC because he did not have an adequate response to Pegasys and Ribavirin after 8-12 weeks; his virus level was "easily detectable" on October 29th; retreatment has a less than 15% chance of response, which did not outweigh potential side-effects and risks; and he had "psychiatric behavioral disturbances (swallowing razor blades)" meaning that the treatment would carry increased risks.

Also during December 2004, he wrote Dr. Haas a letter informing him that he was not receiving treatment for his Hepatitis C. The plaintiff received a letter from Dr. Haas stating that he was not eligible for treatment because, among other things, he had not responded to the medication Pegasys. The plaintiff alleges in his complaint that Pegasys was not the medication he had been receiving when he was still in jail.

The plaintiff also has attached to his complaint a letter that he wrote to Commissioner

Rees contesting the reasons that Commissioner Rees had given for not continuing his treatment, stating that, in fact, he had been receiving Infergen, not Pegasys; that the reason that the virus was detectable on October 29th was because his treatment already had been stopped at that point; and that he had been told that he would have an 80% chance of success had he stayed on the treatment. Commissioner Rees responded in a letter dated February 9, 2005, that the plaintiff was not eligible for treatment because, regardless of the treatment provided, the plaintiff was not favorably responding; the 80% success rate claimed by the plaintiff was not supported by the scientific literature; and his self-harmful behavior, regardless of the reason, caused “grave concern” as to the plaintiff’s ability to psychiatrically tolerate the treatment regime.

The plaintiff further alleges that for three or four weeks between May and July 2005 he was forced to live in a dormitory at KSR without ventilation or air conditioning while the interior of the dormitory was being painted with paint containing dangerous chemicals that can aggravate medical conditions like liver conditions. The plaintiff states that on July 6, 2005, he again filed a grievance regarding not receiving his Hepatitis-C medication and for being exposed to the toxic paint. That grievance, which is attached to the complaint, details that he had been told by the KSR grievance aide that he could not file another grievance until six months had elapsed from the last grievance and that it had been more than six months. He stated that, except for Vitamin E, he still had not received any treatment for his Hepatitis C. He also stated that for three weeks he had been subjected to paint fumes and that, since that time, his liver and kidneys had been “swelling and hurting.” The informal resolution stated that the plaintiff’s DOC primary care provider would determine if testing was indicated for paint exposure and that all inmates were subject to the Kentucky DOC Hepatitis-C treatment protocols and the recommendations of Dr.

Shedlofsky, the Kentucky DOC Hepatitis-C specialist.

The plaintiff indicated that he was dissatisfied with the result of his grievance. His grievance was denied on July 26, 2005, by the Health Care Grievance Committee, consisting of Dr. Everson, Nurse Sandelin, and Nurse Barnard, for the reason given in the informal resolution. The committee noted that the plaintiff had an appointment the next week with Dr. Khayat, with whom he could discuss his concerns. He appealed, and again was denied on September 21, 2005, by Dr. Haas, who stated that "[a]ll HepC treatment in the KY DOC is governed by the Hepatitis C Management Plan."

Also attached to his amended complaint is a fax dated December 2005 regarding the plaintiff's treatment for Hepatitis C by the DOC. It appears to be from Dr. Steven Shedlofsky, Director, Hepatitis C Management Plan, DOC.[2] Dr. Shedlofsky states that he had reviewed the results of blood work drawn on August 12, 2005, and that he had last reviewed the plaintiff's medical records on December 8, 2004, when he noted that the plaintiff "was a non-responder to pegIFN/ribavirin while being treated by Dr. Bennett Cecil while in Louisville Metro or Jefferson County Jail." Dr. Shedlofsky continued, "Although there was a court order to consider continuing Dr. Cecil's therapy when inmate was transferred to the DOC, the inmate doesn't qualify under current HCV management policies." Dr. Shedlofsky also stated that he had not seen recent details of the plaintiff's medical conditions, although he was aware that the plaintiff is a "42yo AAM with significant psychiatric history."

The plaintiff states that, in February 2006, he received lab results which, according to Dr.

[2] The signature line on that fax is for Dr. Shedlofsky. However, no actual signature appears on the fax.

Cecil, indicated that his liver had been damaged by chronic Hepatitis C. He has attached a February 23, 2006, letter from Dr. Cecil stating that he had received lab results for the plaintiff and that the plaintiff had relapsed and that his "elevated liver enzymes indicate[d] damage from the chronic hepatis C." Dr. Cecil recommended that the plaintiff be "treated with Infergen plus ribavirin for hopefully two years to reduce the risk of another relapse." The plaintiff states that once he received that letter he repeatedly made trips to the medical department seeking treatment but was refused. He further alleges that he was placed in segregation and received a disciplinary report because of his repeated trips to the medical department. The plaintiff again wrote the governor in March 2006 regarding his medication. The governor responded that the plaintiff was not eligible for treatment.

On March 24, 2006, the plaintiff was transferred to EKCC. He states that he made the medical department there aware of his medical condition but was told that the EKCC medical department does not treat inmates with Hepatitis C. He alleges that on April 18, 2006, Dr. Everson faxed to Dr. Haas "false information concerning his mental state and weight," and that that false information was used as a reason to deny him treatment. The plaintiff alleges that as a result of the lack of treatment his condition has worsened and his virus level has risen from 620 to 24,700,000.

As relief, the plaintiff requests money damages of $1,000,000 from each defendant; injunctive relief in the form of treatment and refraining from retaliatory actions against him; punitive damages of $150,000 from each defendant; and permission to amend or supplement as discovery develops.

## II. ANALYSIS

When a prisoner initiates a civil action seeking redress from a governmental entity, officer or employee, the trial court must review the complaint and dismiss the action, if the court determines that it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915A(b)(1) and (2). A claim is legally frivolous when it lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). The court may, therefore, dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. *Id.* at 327. When determining whether a plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in a light most favorable to the plaintiff and accept all of the factual allegations as true. *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 424 (6th Cir. 2002). A complaint, or portion thereof, should be dismissed for failure to state a claim upon which relief may be granted "only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).

While a reviewing court must liberally construe *pro se* pleadings, *Boag v. MacDougall*, 454 U.S. 364, 365 (1982) (per curiam), a plaintiff is required to plead more than bare legal conclusions. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996). Therefore, the "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* (internal quotation marks and citations omitted).

To establish an Eighth Amendment violation premised on inadequate medical care, a

prisoner must demonstrate that the defendant acted, or failed to act, with "deliberate indifference to serious medical needs." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Terrance v. Northville Reg'l Psychiatric Hosp*., 286 F.3d 834, 843 (6th Cir. 2002). Thus, to state a cognizable claim, a prisoner must show that the official "acted or failed to act despite his knowledge of a substantial risk of serious harm" to the inmate. *Terrance*, 286 F.3d at 843 (quoting *Farmer*, 511 U.S. at 842). Less flagrant conduct, however, may still evince deliberate indifference where there is "a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *Id.* (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). Such grossly inadequate care is "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

*A. Claims against Warden Chandler*

The plaintiff's allegations against Warden Chandler are that the warden was deliberately indifferent to the plaintiff's serious medical needs because he was aware of the plaintiff's medical condition from court orders, letters, reports, and grievances but still refused him treatment and that he was aware of the dangers of the "toxic" paint and still forced the plaintiff to be exposed to it for three to four weeks. However, the plaintiff does not include any specific instances in which Warden Chandler was made aware of the plaintiff's requests for medical treatment, and none of the documentation attached to the plaintiff's complaint demonstrates that Warden Chandler was made personally aware of the plaintiff's claimed denial of treatment. "[A] § 1983 action liability cannot be based on a theory of respondeat superior." *Taylor v. Michigan*

*Dept. of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995). Instead, there must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it by, at a minimum, a showing that the supervisory official implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate employee. *Id.*

The plaintiff has not made the required showing with regard to Warden Chandler. Consequently, the plaintiff's claims against Warden Chandler will be dismissed.

*B. Injunctive relief*

The plaintiff requests injunctive relief in the form of ordering immediate treatment and ordering that the defendants refrain from retaliation. The plaintiff's requests for injunctive relief as to all of the defendants employed by RCC and KSR, *i.e.*, Nurses Barnard and Crall and Deputy Wardens Holden and McGuire, are moot because he is now incarcerated at EKCC. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996). Those claims against those defendants will therefore be dismissed. Because the only allegations in his complaint concerning retaliation involve Nurses Crall and Barnard, the plaintiff's claim for injunctive relief to enjoin retaliatory action also will be dismissed in its entirety.

*C. Monetary damages against the defendants in their official capacities*

The plaintiff sues each of the defendants in their individual and official capacities. With regard to his official capacity claims, the claims brought against the defendants are deemed claims against the Commonwealth of Kentucky itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). To state a § 1983 claim, a plaintiff must allege that a "person" acting under color of state law deprived the plaintiff of a right secured by the Constitution or federal law. *See* § 1983.

States, state agencies, and state officials sued in their official capacities for money damages are not "persons" subject to suit under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, because the plaintiff seeks money damages from these state officers in their official capacities, he failed to allege cognizable claims under § 1983. Moreover, the defendants are immune from monetary damages under the Eleventh Amendment. *See id.*

Because the plaintiff failed to state a claim upon which relief could be granted and because he seeks monetary relief from defendants who are immune from such relief, the Court will dismiss the claims for monetary damages against the defendants in their official capacities.

## III. CONCLUSION

The Court will enter a separate order dismissing all claims against Warden Chandler; all injunctive relief claims against Nurses Barnard and Crall and Deputy Wardens Holden and McGuire; the plaintiff's claims for retaliation; and all claims for monetary damages against each of the defendants in their official capacities. The Court also will enter a separate scheduling order governing the remaining claims. In permitting the remaining claims to go forward, the Court passes no judgment on the merits or ultimate outcome of this case.

Date: October 11, 2006

John G. Heyburn II
Chief Judge, U.S. District Court

cc: Plaintiff, *pro se*
Defendants
General Counsel, Justice & Public Safety Cabinet, Office of Legal Counsel

4412.009