## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

**TODD EDWARD EDMONDS**                                                    **PLAINTIFF**

**v.**                                            **CIVIL ACTION NO. 3:06-CV-P301-H**

**JOHN D. REES, et al.**                                                  **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion of Defendants John Rees, Ron Everson, and Dr. Scott Haas for summary judgment in their favor (DN 43).[1]  Plaintiff has filed a response (DN 57).  Defendants Rees, Everson, and Haas have replied to that response (DN 67).  There are two outstanding motions which must be addressed before the merits of the summary-judgment motion can be decided.

**Defendants' Motion to Strike (DN 70)**

Plaintiff has filed a document, entitled "Plaintiff's Response to Defendants['] Reply to Plaintiff's Response" (DN 68), which is effectively a surreply to Defendants' response.  Defendants have filed a motion to strike Plaintiff's response (DN 70), arguing that a surreply is not permitted by the Local Rules.  They urge the Court to strike it from the docket.  Plaintiff has responded (DN 74).

The Court is not inclined to strike the document given Plaintiff's *pro se* status and the fact that the arguments in the document in question, though relevant, largely reiterate those contained in Plaintiff's response.  Therefore, Defendants' motion to strike (DN 70) is **DENIED**.

---

[1]Defendant Lisa Crall did not join in the motion.

**Plaintiff's Motion for Inclusion in the Record (DN 73)**

Almost a month after Plaintiff filed his surreply, Plaintiff filed a motion to include in the record certain documents for purposes of deciding the summary-judgment motion (DN 73). Several documents already appear in the record as attachments to other filings by Plaintiff. The "new" documents Plaintiff now wishes to be considered in deciding the summary-judgment motion are nine affidavits, all of which are dated between April and August 2007, from Kentucky Department of Corrections inmates, who aver that they have tested positive for Hepatitis C but have not received any treatment; and a sick-call request dated November 12, 2007, containing complaints of liver pain and swelling. He asserts only that the affidavits and exhibits will have a "substantial impact" on the Court's ruling.

The rules do not contemplate unlimited opportunities to oppose the summary-judgment motion, which was filed over six months before his current motion. His motion does not give any reason why these affidavits or records were not submitted earlier. Therefore, Plaintiff's "Motion for Inclusion in the Record" (DN 73) is **DENIED**. Defendants' motion to strike Plaintiff's motion for inclusion in the record (DN 76) is **GRANTED**.

**Defendants' Motion for Summary Judgment**

Having decided the issue of Defendants' motion to strike and Plaintiff's motion to include additional documents in the record, the matter of Defendants' motion for summary judgment is now ripe for review.

## I. SUMMARY OF CLAIMS

The following facts, except where indicated, are not disputed and are gleaned from the attachments to the complaint, the amended complaint, Defendants' motion for summary

judgment, and Plaintiff's responses thereto.  In a nutshell, the crux of Plaintiff's complaint is his belief that the Department of Corrections (DOC) should have continued the Hepatitis C treatment regime he was undergoing when he entered DOC custody.  Defendants contend that because Plaintiff does not meet the treatment criteria outlined in their Hepatitis Management Plan, their actions or inactions regarding that treatment are not deliberate indifference to a serious medical need.

Plaintiff has had Hepatitis C (HCV)[2] since at least 1997 and also suffers from diabetes and mental illness.  Plaintiff was first seen for his HCV by Dr. Bennett Cecil during a period in which he was not in prison.  Before Dr. Cecil could begin antiviral therapy, Plaintiff was incarcerated at Louisville Metro Corrections.  While incarcerated, Plaintiff had psychiatric problems, including swallowing pieces of razor blades in September and October 2001, requiring management by the University of Louisville Hospital.  Louisville Metro denied Plaintiff's request for antiviral therapy for his Hepatitis C based on his psychiatric contraindications.  However, Louisville Metro did send Plaintiff to see Dr. Cecil on April 17, 2003.  Despite Plaintiff's psychiatric problems, Dr. Cecil began antiviral therapy.[3]

---

[2]According to the Department of Corrections (DOC) Hepatitis Management Plan (revised January 2, 2004), portions of which are attached to Defendants' motion for summary judgment, "Hepatitis C is a virus (HCV) that can cause liver disease.  The virus is found in the blood and liver of infected people and lives in the liver for many years.  Most people who have HCV do not get serious liver disease.  But about 15% to 20% of infected people do develop cirrhosis and liver failure after several decades of infection."

[3]Plaintiff attached to his amended complaint two orders from a Kentucky state court judge, Judge Stephen Mershon, in *Commonwealth v. Edmonds*, No. 01CR2382.  In an order dated August 7, 2003, Judge Mershon requested that the DOC "assure that [Plaintiff] receives all medical treatment and medications recommended by Dr. Bennett Cecil."  An order from Judge Mershon dated June 17, 2004, stated that all parties agreed that Plaintiff would stay under the care and treatment of Dr. Cecil "through and possibly beyond the original sentencing date of October 8th, 2004."  However, that order also stated that "[t]he Court explained that the [DOC] would provide [Plaintiff] with treatment but the Court could not guarantee that he would continue on the same treatment regime or that Dr. Cecil would continue to treat him."

Starting in June 2003, Dr. Cecil began treating Plaintiff with the medication Pegasys.  On August 20, 2003, Plaintiff injured his right leg.  In September 2003, Plaintiff swallowed pieces of broken glass and was placed on suicide watch.  In December 2003, Dr. Cecil added the drug Ribavirin to Plaintiff's antiviral therapy.  However, because those medications were not working, in March 2004, Dr. Cecil prescribed Infergen and Ribavirin.  A May 20, 2004, letter from Dr. Cecil to Judge Mershon stated, "I received the viral level back on Todd Edmonds and I am delighted that he is now undetectable for HCV RNA (less than 10 IU/mL)."  Lab reports from August 2004 also reported HCV levels of less than 10 IU/mL.  Dr. Cecil planned to treat Plaintiff with this combination of drugs for 48 weeks.  Approximately seven months (29 weeks) into this regimen, Plaintiff suffered a psychotic episode, swallowing three razor blades and, as a result, was hospitalized from October 19 until October 28, 2004, at the University of Louisville Hospital.  During this hospitalization, the medications prescribed by Dr. Cecil were stopped.  On October 29, 2004, a lab report stated that Plaintiff had HCV RNA of 620 IU/ml.  *See* Exhibit 6 to Defendants' motion (DN 57).

On October 28, 2004, Plaintiff was transferred to Roederer Correctional Complex (RCC), which is part of the Kentucky Department of Corrections (DOC).  The DOC has a plan for managing Hepatitis C in the inmate population.  The DOC Hepatitis Management Plan as revised January 2, 2004, lists "Absolute Exclusion Criteria."  Included among the "Absolute Exclusion Criteria" are "[p]revious nonresponse or relapse with Interferon (at least 3 million units, 3 times per week or pegylated Interferon weekly) and daily Ribavirin, after at least 12 weeks of therapy"; "[p]oor control of a major medical illness [including diabetes]"; "[r]ecent history of major depression or poor control of a major psychiatric illness; suicide attempt within last 4

4

years;" and persistently normal ALT values.[4]  Plaintiff has been incarcerated at various DOC facilities since October 2004 and, despite repeated efforts on his part to have DOC restart his antiviral therapy as prescribed by Dr. Cecil, DOC has not resumed antiviral therapy for him.  In November 2004, he filed a grievance asserting that recent lab results showed that his Hepatitis C was worsening because he had not been receiving the treatment.  Plaintiff's grievance was denied because the RCC medical staff was following the DOC's protocol for treatment of Hepatitis C.

In a December 14, 2004, letter from Dr. Cecil to Plaintiff, Dr. Cecil stated that he was sorry to hear that Plaintiff had been taken off of the treatment.  Dr. Cecil stated that his treatment would have to be restarted and that he would have about a 90% chance of responding to Infergen/Ribavirin therapy since he had responded previously.

On December 8, 2004, Dr. Steven Shedlofsky, Director of the DOC Hepatitis Management Plan, reviewed Plaintiff's record.  Dr. Shedlofsky considered Plaintiff not to be a candidate for antiviral therapy because of his psychiatric history and the fact that he had detectable virus after six months of antiviral therapy.  He did suggest that Plaintiff be de-ironed.

After being transferred to the Kentucky State Reformatory (KSR) in December 2004, Plaintiff gave the KSR medical department information about his prior treatment by Dr. Cecil. KSR doctor, Dr. Khayat, prescribed Infergen for Plaintiff and sent a Non Formulary Medication Request Form to Dr. Haas, the DOC medical director, who approved it.  However, as will be explained later, Dr. Haas's approval had been based on his assumption that Dr. Shedlofsky had approved Plaintiff for treatment under the DOC Hepatitis Management Plan.  Because, in fact,

---

[4]According to the DOC Hepatitis Management Plan, an "ALT" is a test done on liver functioning.

Dr. Shedlofsky found Plaintiff to be ineligible under the management plan, Infergen was never provided to Plaintiff.

On December 29, 2004, Plaintiff wrote to the governor asking for an investigation into the fact that his treatment for Hepatitis C had been stopped when he entered state custody. Plaintiff received a response from Commissioner Rees dated January 12, 2005, that he was not eligible for treatment under the DOC plan because he did not have an adequate response to Pegasys and Ribavirin after 8-12 weeks; his virus level was "easily detectable" on October 29, 2004; retreatment has a less than 15% chance of response, which did not outweigh potential side-effects and risks; and he had "psychiatric behavioral disturbances (swallowing razor blades)," meaning that the treatment would carry increased risks.

Also during December 2004, Plaintiff wrote Dr. Haas, the DOC medical director, a letter stating that he was not receiving treatment for his Hepatitis C as prescribed by Dr. Cecil.  Dr. Haas responded that he was not eligible for treatment because, among other things, he had not responded to the medication Pegasys.  As Plaintiff points out, Pegasys was not the medication he had been receiving when his HCV medication was discontinued.

Plaintiff then wrote to Commissioner Rees contesting the reasons that Commissioner Rees had given for not continuing his treatment, asserting that, in fact, he had been receiving Infergen, not Pegasys; asserting his opinion that the reason that the virus was detectable on October 29, 2004, was because his treatment already had been stopped at that point; and asserting that he had been told that he would have an 80% chance of success had he stayed on the treatment.  Commissioner Rees responded by letter that Plaintiff was not eligible for treatment because, regardless of the treatment provided, Plaintiff was not favorably responding;

the 80% success rate claimed by Plaintiff was not supported by the scientific literature; and his self-harmful behavior, regardless of the reason, caused "grave concern" as to Plaintiff's ability to psychiatrically tolerate the treatment regime.

In January 2005, Plaintiff was successfully de-ironed as recommended by Dr. Shedlofsky.  During most of 2005 and 2006, Plaintiff's diabetes was only marginally controlled, and he was on perphenazine therapy for his psychosis.

In May and July 2005, Plaintiff's dormitory at KSR was painted.  Plaintiff alleges that the painting occurred, without ventilation or air conditioning, with paint containing dangerous chemicals that can aggravate medical conditions like liver conditions.  On July 6, 2005, he again filed a grievance regarding not receiving his HCV medication and for being exposed to the paint, which he asserted caused his liver and kidneys to swell and hurt.  His grievance was denied based on Plaintiff's ineligibility for antiviral treatment under the DOC Hepatitis Management Plan.

In December 2005, Dr. Shedlofsky reviewed the results of blood work drawn on Plaintiff on August 12, 2005.  Plaintiff's complete blood count and ALT were normal.  Dr. Shedlofsky stated that Plaintiff did not qualify "under current HCV management policies."  Dr. Shedlofsky also stated that he had not seen recent details of Plaintiff's medical conditions, although he was aware that Plaintiff is a "42yo AAM with significant psychiatric history."

In a February 2006 letter, Dr. Cecil stated that he had reviewed Plaintiff's lab results at Plaintiff's request, and opined that the lab results revealed that Plaintiff had relapsed and that his "elevated liver enzymes indicate[d] damage from the chronic hepatis C."  Dr. Cecil recommended that Plaintiff be "treated with Infergen plus Ribavirin for hopefully two years to

7

reduce the risk of another relapse."  Plaintiff stated in his complaint that once he received that letter he repeatedly made trips to the medical department seeking treatment but was refused.

On April 26, 2006, after Plaintiff was transferred to the Eastern Kentucky Correctional Complex, Dr. Everson found him to be ineligible for antiviral therapy because of, among other things, Plaintiff's psychosis and the fact that Plaintiff had at least three ALT lab tests monitored over a two- to six-month period with the mean of the three ALT values not greater than 1.5-fold normal.[5]  Plaintiff alleges that as a result of the lack of treatment his condition has worsened and his virus level has risen from 620 to 24,700,000.

In support of their motion for summary judgment, Defendants offer the affidavit of Dr. Shedlofsky, who avers, among other things, that he is a Professor of Internal Medicine in the Division of Digestive Diseases and Nutrition at the University of Kentucky Medical Center; Professor of Toxicology at the University of Kentucky; and the Chief of Gastroenterology at the Lexington Veterans Hospital.  He avers that he has had extensive training and patient treatment experience with Hepatitis C.  He states that he has carefully reviewed all of the medical records made available to him regarding Plaintiff's Hepatitis C.

Dr. Shedlofsky avers that it is a significant fact that on October 29, 2004, after having been off of the Infergen/Ribavirin therapy for only ten days, an HCV RNA test revealed that Plaintiff's HCV was 620 IU/ml.  Dr. Shedlofsky states, "The fact that he had detectable virus after 7 months of antiviral therapy meant that he was a treatment nonresponder to that therapy."

---

[5]Dr. Everson also found him ineligible because of his poorly controlled diabetes and his body mass index.  Plaintiff disputes that his weight and diabetes were ever appropriate reasons for denial of antiviral therapy.  Defendants concede that Plaintiff's weight and diabetes would not currently be reasons to deny antiviral therapy.  Because the record shows that Defendants properly relied on other absolute exclusion criteria in deciding that antiviral therapy was not warranted, the Court will not in this Memorandum Opinion explore all the parties' contentions regarding Plaintiff's weight and diabetes.

Dr. Shedlofsky avers that in December 2004 he reviewed the information he had at the time regarding Plaintiff and concluded he was not a candidate for further antiviral therapy because of Plaintiff's recent psychotic episode, the fact that he had detectable virus after 6 months of Infergen/Ribavrin therapy, and the fact that he did not have a liver biopsy.  According to Dr. Shedlofsky's affidavit, all inmates with genotype 1 hepatitis C virus have to have "advanced > stage F2 fibrosis" to receive therapy.

Dr. Shedlofsky also avers that it is his opinion that Plaintiff remains a poor candidate for Interferon-based antiviral therapy because he has had two major psychotic outbreaks while being treated by Dr. Cecil.  He also relies on his observation that Plaintiff was a non-responder to the therapy.  Dr. Shedlofsky states that he strongly disagrees with Dr. Cecil's assessment that Plaintiff would have had a "90% chance of response" and therefore should be treated again with Infergen/Ribavirin therapy.  According to Dr. Shedlofsky, Dr. Cecil quotes unrealistically optimistic results using Infergen.  Finally, Dr. Shedlofsky states that it is not known whether antiviral therapy is required for Plaintiff because it is not known whether Plaintiff has advanced liver fibrosis as no records indicate that he has had a liver biopsy.  However, Dr. Shedlofsky avers that he does not believe that it would be appropriate to perform a liver biopsy now because, even were advanced fibrosis found, antiviral therapy is contraindicated.[6]

In response (DN 57), Plaintiff argues that his receiving blood tests and ultrasounds and being seen by a gastroenterologist and prescribed Vitamin E do not constitute treatment of his Hepatitis C.  He asserts that in January 2005, a DOC doctor, Dr. Khayat, prescribed Infergen and

_____

[6]Dr. Shedlofsky further avers that on September 12, 2006, he considered a request from a DOC doctor for a liver biopsy for Plaintiff but did not believe that one was warranted given Plaintiff's co-morbidities.

9

Ribavirin but the treatment still was not given to Plaintiff, and he attaches his affidavit which so avers.  Attached to his response is a DOC "Non Formulary Medication Request Form" dated as received on January 18, 2005, requesting Infergen for Plaintiff and some other medical records showing that in December 2004 Dr. Khayat prescribed Infergen.[7]  He argues that Defendants are wrong to claim that he did not respond to the Infergen treatment because in fact he was responding to it until it was stopped by Defendants six months before it was supposed to be.

Without mentioning the October 2004 razor-swallowing incident, Plaintiff asserts that he is not at risk for self-injury if he is on the antiviral therapy.  Instead, he argues that to refuse to give him life-saving therapy because of possible side effects is deliberate indifference to a serious medical need.  He also argues that the DOC Hepatitis Management Plan states that if psychiatric side effects occur antiviral therapy can be resumed, if Psychiatry agrees, with careful monitoring, which he says was not an option offered to him.[8]  He points to a March 7, 2006, letter in which Dr. Cecil expressed his belief that were Plaintiff treated with anti-depressants and monitored he would have a good chance of avoiding additional psychiatric problems relating to treatment.  He relies on a February 2007 report from Dr. Tom Morton, which noted as a provisional diagnosis:  "mild paranoid tendencies."  Actually, that report states under the

---

[7]Although difficult to read, it appears to have been signed by Dr. Khayat.

[8]Attached as exhibit 11 to his reply is a DOC form for psychiatric review for HCV patients on Interferon Rx.  This form states that "[s]evere depression and other psychiatric disorders can occur as a side effect of Interferon therapy."  That form lists five mental-health questions that should be asked at each medical follow-up visit, and states that, if there is an affirmative answer to any of the questions, the Interferon/Ribavirin prescription should be held and a referral to psychiatric services should be made.  That form then states:  "(Note: Inmate may be restarted on Interferon/Ribavirin only if cleared by Psychiatrist.)"  This form prescribes a course of action for patients who admit to having self-harmful thoughts.  It would not appear to apply to patients, like Plaintiff, who already have engaged in self-harmful behavior.

10

heading "Problems" the following:  "Psychotic disorder 298.9  Suspected 9/14/2006 provisional dx-hx mild paranoid tendencies."  *See* Exhibit 13 to Plaintiff's reply to summary judgment motion.

Plaintiff also filed an affidavit (DN 61).  He avers that he was evaluated by a DOC psychologist in November 2004 who recommended that "his treatment needs to continue as prescribed."  He appears to interpret that statement as the psychologist endorsing continued antiviral treatment.  He attaches the report from the psychologist to which he is referring.  It is not clear to the Court that the psychologist is recommending that Plaintiff be continued on antiviral therapy.  The first of the two pages attached by Plaintiff is entitled KDOC "Mental Health Appraisal Clinician's Coversheet," and contains some notes regarding his mental health history.  The next page is entitled "Summary and Recommendations," and states in the "Notes" section: "Outstanding medical needs – treatment needs to continue as prescribed; Psychological follow up needed."  Nothing on either page remarks on his HCV or antiviral therapy.[9]

Attached to Defendants' reply (DN 67) is another affidavit from Dr. Shedlofsky averring that Plaintiff's requests for antiviral therapy have been denied in accordance with the DOC policy on Hepatitis C and that nothing in Plaintiff's response to the summary-judgment motion changes his professional opinion that Plaintiff is not an appropriate candidate for antiviral therapy.  He avers that although he no longer considers Plaintiff's diabetes and weight to be contraindications to the therapy, Plaintiff's psychiatric instability and the fact that he was a nonresponder to therapy both dictate that antiviral therapy is not appropriate.  Dr. Shedlofsky

---

[9]Unfortunately, Defendants do not address this report in their reply.  Also unfortunate is Defendants' choice to submit what appears to be Plaintiff's entire medical file, forcing the Court to comb through voluminous medical records in preparing this Memorandum Opinion.

avers that he interprets Plaintiff's medical records to include the following suicide attempts making him ineligible for therapy: a self-inflicted right leg fracture in August 2003; swallowing broken glass fragments in September 2003; and swallowing razor blades in October 2004. Dr. Shedlofsky also more fully explains the reasons that he considers Plaintiff a nonresponder to the therapy. He states that, even in 2004, the standard of care was to check for detectable HCV RNA at 24 weeks of therapy and to discontinue therapy if any RNA was detected; because this was not done with Plaintiff there was no way to know if he was responding after 24 weeks of therapy. However, Dr. Shedlofsky avers, if Plaintiff had been responding to the Infergen therapy his virus should have been more profoundly suppressed than it was after 30 weeks. Dr. Shedlofsky avers that it is his opinion that the antiviral therapy never adequately suppressed Plaintiff's virus and that he should be categorized as a previous non-responder, making him ineligible for further treatment.

Defendants also attach the affidavit of Dr. Haas, who avers that he is a board-certified psychiatrist and the medical director for the DOC. He further avers that treatment with Interferon-based medications has the potential for serious psychiatric disturbances and that because Plaintiff recently had been treated with anti-psychotic medication for a mental health problem and engaged in self-harm behavior by swallowing razor blades he is at increased risk for psychiatric disturbance were he to be re-treated with Interferon-based drugs. He explains that Pegasys and Infergen are Interferon-based drugs.

Dr. Haas also avers that he has reviewed the non-formulary request by Dr. Khayat from January 2005 attached to Plaintiff's response. Dr. Haas states that he authorized that medication as he does for all non-formulary requests for HCV medication based on an assumption that Dr.

Shedlofsky previously had approved the inmate for treatment under the DOC Hepatitis-C plan. However, Dr. Haas further avers that Dr. Shedlofsky never had approved re-treatment for Plaintiff.  He also avers that Plaintiff has had his liver enzymes and functioning monitored while in custody and that Vitamin E[10] supplements were ordered for him on three occasions.  He further avers that Plaintiff's most recent labs demonstrate normal serum Ferritin level, indicate no need for de-ironing at this time, and indicate that his liver is currently functioning normally.

## II. <u>ANALYSIS</u>

### A.      Summary-judgment standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof.  *Id.*  Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof.  *Id.*  If the nonmoving party will bear the burden at trial on a dispositive issue, the nonmoving party must go beyond the pleadings and by his own affidavits, "or by the

---

[10]The DOC Hepatitis Management Plan recommends that inmates who have Hepatitis C and who do not qualify for antiviral therapy take 800 IU of Vitamin E each day.  Plaintiff's canteen records from August 8, 2007, to January 7, 2008, show that Plaintiff made a number of purchases, including Vitamin E.

depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted, citing FED. R. CIV. P. 56(e)). If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990). The moving party, therefore, is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id*. (internal quotation marks omitted). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Id*. at 323-24.

In their summary-judgment motion, Defendants argue that Plaintiff's claims relating to any action or inaction by Defendants prior to June 19, 2005, are barred by the statute of limitations. They further argue that they were not deliberately indifferent to Plaintiff's serious medical needs in that Plaintiff has only stated a disagreement with the treatment decisions of the medical professionals in this case. They also argue that he has failed to allege a causal connection between Defendants and the alleged constitutional violations. Finally, they argue that they are entitled to qualified immunity. Because the Court finds that Defendants are entitled

14

to summary judgment because Plaintiff has only stated a disagreement with his treatment, which does not give rise to a constitutional claim, the Court will grant the motion on that ground and will not address Defendants' other arguments.

**B.      Deliberate-indifference claim relating to treatment for Hepatitis C**

To establish an Eighth Amendment violation premised on inadequate medical care, a prisoner must demonstrate that the defendant acted, or failed to act, with "deliberate indifference to serious medical needs." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). Thus, to state a cognizable claim, a prisoner must show that the official "acted or failed to act despite his knowledge of a substantial risk of serious harm" to the inmate. *Terrance*, 286 F.3d at 843 (quoting *Farmer*, 511 U.S. at 842). Less flagrant conduct, however, may still evince deliberate indifference where there is "a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *Id.* (quoting *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999)). Such grossly inadequate care is "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Defendants do not dispute, and the Court agrees, that Hepatitis C represents a serious medical need. *Coleman-Bey v. United States*, 512 F. Supp.2d 44 (D.D.C. 2007) ("[C]hronic Hepatitis C infection presents a serious medical need as the condition may lead to liver disease, including cirrhosis.) The issue is thus whether Defendants have been deliberately indifferent to Plaintiff regarding his Hepatitis C.

15

The crux of Plaintiff's complaint regarding his Hepatitis C is that when he entered DOC custody the Hepatitis C medications ordered by Dr. Cecil (Infergen and Ribavirin) were discontinued and never restarted despite Plaintiff's desire to continue that treatment.  His position is not unreasonable given the letters from Dr. Cecil indicating his belief in October 2004 that if Plaintiff remained undetectable for the virus after treatment until April 15, 2005, Plaintiff would have about an 80% chance of staying negative for the virus, and Dr. Cecil's later letter indicating his belief that Plaintiff has a 90% chance of responding to the antiviral therapy again.

Defendants contend that Plaintiff does not now and never has since being in DOC custody qualified for treatment under the DOC Hepatitis C plan and that Dr. Cecil's belief that the antiviral therapy was working and that it should be restarted is not warranted.  The standard applied in reviewing the actions of prison doctors and medical staff in this type of case is deferential.  *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). Courts will generally refrain from "second guessing" the adequacy of a particular course of treatment where a prisoner has received some medical attention and the dispute concerns the adequacy of that treatment.  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  Since there are many ways to treat an illness or ailment, courts generally do not hold prison doctors to the recommendations of other doctors.  *See White v. Napoleon*, 897 F.2d 103, 1010 (3d Cir. 1990).  Moreover, "[a]s numerous courts have acknowledged, [H]epatitis C does not require treatment in all cases."  *Hix v. Tenn. Dept. of Corr.*, 196 Fed. Appx. 350, 357 n.1 (6th Cir. 2006).

Dr. Shedlofsky has averred that Plaintiff was a non-responder to the therapy, which warrants not starting the therapy again under the DOC Hepatitis Management Plan.  Plaintiff does not offer anything to refute his non-responder status except his opinion that the viral levels

16

recorded in October 2004 are directly attributable to having his therapy stopped early and was not a good indicator that he was not responding.  This is his layman's opinion.  Dr. Shedlofsky averred that it is a significant fact that after having been off of the Infergen/Ribavirin therapy for only ten days, a test revealed that he had HCV RNA of 620 IU/ml.  None of Dr. Cecil's letters directly refute Dr. Shedlofsky's statement that it was significant that Plaintiff had detectable virus after only 10 days off of the therapy.  Dr. Cecil's letters do indicate that Dr. Cecil believes that Plaintiff's treatment had been stopped too early and that the therapy should be restarted, even given Plaintiff's psychiatric history, because Dr. Cecil believes that Plaintiff has a 90% chance of responding to the antiviral therapy again.  Dr. Shedlofsky's affidavit disagrees with Dr. Cecil's assessment, averring that Dr. Cecil uses unrealistically optimistic results and averring that in his opinion the medical literature would indicate only a 10-15% chance of success, which, given the risk factors for Plaintiff, would not be worth it.  There is obviously a disagreement between Dr. Cecil and Dr. Shedlofsky about whether Plaintiff was responding to the therapy, whether the therapy should be restarted, and what Plaintiff's chances of success were on that therapy.  However, mere disagreement about treatment does not give rise to a constitutional claim.  "By attempting to allege a case for malpractice in the context of a civil rights complaint, [P]laintiff has effectively pled himself out of a cause of action."  *Loukas v. Mich. Dept. of Corr.*, No. 2:07-CV-142, 2008 WL 544639 at *3 (W.D. Mich. Feb. 27, 2008).

Plaintiff's psychiatric history makes continuing the therapy contraindicated, as stated in Dr. Shedlofsky's affidavit.  Clearly, given the two psychotic episodes suffered by Plaintiff while on the therapy, Dr. Shedlofsky had legitimate concerns with continuing the therapy.  Dr. Cecil offers his opinion that, even with a psychiatric history of swallowing razor blades, Plaintiff could

17

be treated with antidepressants and monitored for a very good chance of not having additional

psychiatric episodes related to treatment.  Again, Dr. Shedlofsky and Dr. Cecil clearly disagree

on this point, but such a disagreement does not create a constitutional claim.  At most, Plaintiff

has established a disagreement between doctors as to how best to treat his Hepatitis C, which is

not enough to defeat the motion for summary judgment.  *See Westlake*, 537 F.2d at 860 n.5.

Dr. Cecil and the DOC doctors also disagree as to whether Plaintiff's liver is being

impacted by HCV thereby requiring treatment.  A February 2006 letter from Dr. Cecil stated his

opinion that Plaintiff had elevated liver enzymes demonstrating liver damage from HCV.  Dr.

Haas has averred that lab tests show that his liver is functioning normally.[11]  Again, the record

reveals only a disagreement between Plaintiff and Dr. Cecil on one hand and Defendants on the

other as to the need for therapy, and such disagreement does not raise a constitutional claim.

Furthermore, a court will generally not find deliberate indifference when some level of

medical care has been offered to the inmate.  *Christy v. Robinson*, 216 F. Supp. 2d 398, 413-14

(D.N.J. 2002).  Here, Plaintiff's contention that he has not received any treatment for his HCV is

inaccurate.  At Dr. Shedlofsky's urging, he was de-ironed, which is one of the recommended,

although optional, courses of treatment for inmates with HCV, according to the DOC Hepatitis

Management Plan.  The DOC Hepatitis Management Plan states, "Since excess liver iron is

associated with increased fibrosis in Hepatitis C patients and iron removal tends to improve ALT

---

[11]The Sixth Circuit has considered the issue of using ALT levels as a basis for refusing antiviral therapy.  In *Johnson v. Million*, 60 Fed. Appx. 548, 549 (6th Cir. 2003), the Sixth Circuit affirmed a grant of summary judgment to Kentucky DOC defendants because it was not deliberate indifference to refuse antiviral treatment to an inmate whose ALT levels remained in the normal range.  *See also Loukas v. Mich. Dept. of Corr.*, 2008 WL 544639 at *3 (court dismissed prisoner plaintiff's § 1983 suit alleging deliberate indifference by prison officials who denied his Interferon treatment for HCV where exhibits showed that his ALTs were not sufficiently elevated to qualify him for consideration for antiviral therapy under Michigan's prison HCV protocol).

values, we strongly recommend that all inmates with serum ferritins >200 be de-ironed." Also,

Plaintiff has been told to take Vitamin E, as recommended for inmates who do not qualify for

antiviral therapy. Moreover, he has been monitored, and his chart has been reviewed by Dr.

Shedlofsky, the DOC Hepatitis C expert, on at least two occasions since he entered DOC

custody.

  In short, Plaintiff has been treated for his Hepatitis C, although not with antiviral therapy,

as Plaintiff wishes and as Dr. Cecil recommends. However, his treatment is consistent with

DOC protocols. Plaintiff has not demonstrated that Defendants were deliberately indifferent,

and Defendants are entitled to summary judgment in their favor on this claim.

**C.**  **Deliberate-indifference claim relating to exposure to paint fumes**

  Plaintiff's allegations in the complaint regarding the painting in the dormitory are that for

three to four weeks he was forced to live in the dormitory while it was being painted without

ventilation or air conditioning. He asserts that the dorm was painted with dangerous, toxic paint

containing medium aliphatic solvent naphtha (petroleum), xylenes, methyl ethyl ketoxime and

ethyl benzene and that the material safety data sheet for the paint warned that repeated over-

exposure can aggravate medical conditions of the liver and kidney.

  Defendants do not dispute that Plaintiff was exposed to paint fumes. However, Dr.

Shedlofsky avers that it is very unlikely that Plaintiff's liver was damaged because if there had

been significant liver toxicity it should have caused a clinically significant episode of right

upper-quadrant pain, nausea, vomiting and jaundice, which did not occur. He also states that

even if there had been low grade sub-clinical liver injury, the most likely clinical outcome is

complete resolution of liver damage and that the compounds in the material safety sheet quoted

19

by Plaintiff are not associated with chronic liver injury.

In response, Plaintiff argues that the paint "could have caused damage to his liver . . . because it contained xylenes which could have an effect on [his] blood and kidneys.  It contained Methyl ethyl ketoxime which could result in cancer.  It contained Ethyl Benzene which is a known carcinogen . . . ."  Plaintiff has offered no evidence to refute the sworn statement of Dr. Shedlofsky that it was unlikely that Plaintiff suffered damage from the paint fumes.  Plaintiff has offered only his speculation that he might have been injured.  Such is not enough to defeat summary judgment.  *See Lucas*, 738 F. Supp. at 217 (holding nonmoving party must do more than raise some doubt as to the existence of a fact).  "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy."  *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (internal quotations omitted).  Consequently, Defendants are entitled to summary judgment on this claim as well.

20

**III. <u>CONCLUSION</u>**

Plaintiff has failed to refute Defendants' arguments and also has failed to demonstrate the existence of genuine issues of material fact.  Therefore, Defendants Rees, Everson, and Haas are entitled to judgment as a matter of law.  The motion for summary judgment will be **GRANTED**. The claims against Defendants Rees, Everson, and Haas will be **DISMISSED** by separate order.

Date:

cc:     Plaintiff, *pro se*
        Counsel of record
4412.009